## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **CURTIS DRESSMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:11-cv-00336** |
| **v.** | ) | |
| | ) | **Judge Nixon** |
| **METROPOLITAN GOVERNMENT OF** | ) | **Magistrate Judge Griffin** |
| **NASHVILLE AND DAVIDSON COUNTY** | ) | |
| **and WILLIAM GISE,** | ) | **JURY DEMAND** |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Pending before the Court are two Motions for Summary Judgment filed by Defendant

William Gise (Doc. No. 65) and Defendant Metropolitan Government of Nashville and Davidson

County ("Metro") (Doc. No. 70), along with supporting Memoranda (Doc. Nos. 66, 71),

Defendants' Joint Statement of Material Facts (Doc. No. 68) and attachments (Doc. Nos. 68-1 to

68-10, 69). Plaintiff Curtis Dressman has filed a Response in Opposition to Defendants' Motions

(Doc. No. 76), along with a Statement of Uncontested Material Facts (Doc. No. 77), a Response to

Defendants' Statement of Facts (Doc. No. 78) and attachments (Doc. Nos. 80-1 to 80-29).

Defendant Gise then filed a Reply (Doc. No. 88), Defendant Metro filed a Reply (Doc. No. 86) with

attachments (Doc. Nos. 86-1 to 86-7), and Defendants filed a Joint Response to Plaintiff's

Statement of Uncontested Facts (Doc. No. 87). For the reasons stated below, Defendant Gise's

Motion (Doc. No. 65) is **DENIED,** and Defendant Metro's Motion (Doc. No. 70) is **DENIED** as to

Plaintiff's federal claim and **GRANTED** as to his state law claim.

1

## I. BACKGROUND

### A. *Factual History*[1]

Plaintiff Curtis Dressman is a resident of Southgate, Kentucky. Defendant Lieutenant William Gise is an employee of the Davidson County Sheriff's Office and was the booking intake sergeant on duty during the events at issue on April 24 and 25, 2010. Defendant, the Metropolitan Government of Nashville and Davidson County, is a political subdivision of the State of Tennessee.

#### 1. Plaintiff's Arrest and Intake

At approximately 11:00 p.m. on April 24, 2010, Metro Nashville police officers arrested Plaintiff for public intoxication in downtown Nashville. Plaintiff was arrested for showing his bare buttocks while walking down Broadway and for becoming belligerent when stopped by the police. Officer Derek Smith transported plaintiff to the Davidson County Criminal Justice Center ("CJC" or "the jail"). Plaintiff refused to get out of the police car when they arrived at the jail, and Officer Smith had to restrain him while waiting for DCSO officers to take him into custody.

At 11:21 p.m., Defendant Gise, the on-duty intake sergeant, took custody of Plaintiff in the jail's booking room, received the arrest report from the Smith, and was aware of Plaintiff's intoxication. In his deposition testimony, Defendant Gise described Plaintiff's behavior during the booking process as "not cooperative; but in the grand scale of booking, he was more than passive resistant, but he was trying to be active resistant." Defendant Gise testified that during the intake process, Plaintiff was cussing, resisting, threatening the officers, and trying to pull away from them.

At approximately 11:25 p.m., Defendant Gise placed Plaintiff into holding cell No. 2 in the jail's "turnkey area," having decided to detain Plaintiff before completing booking because he was

---

[1] Unless otherwise noted, the facts in this section are the undisputed facts taken from both Plaintiff's Response to Defendants' Statement of Facts (Doc. No. 78) and Defendants' Joint Response to Plaintiff's Statement of Facts (Doc. No. 87).

2

intoxicated and had been "acting out." Plaintiff remained in handcuffs while Defendant Gise and Officer Alonzo Jones transported him to the holding cell. The handcuffs were removed when Plaintiff was placed in the holding cell. Plaintiff did not receive a medical screening or a probable cause hearing before he was placed in the holding cell.

### 2. Jaime Lopez's Arrest and Intake

At approximately 11:45 p.m., Metro Nashville police arrested Jaime Lopez for disorderly conduct, public intoxication, resisting arrest and attempted vandalism, after he crossed a police "do not cross tape" during a criminal investigation at his apartment complex.

Officer John David Young, who arrested Lopez, testified that Lopez had run from police and "kicked at one of us" during the arrest. According to Young, Lopez kicked the window of the patrol car several times en route to the CJC, was placed in foot restraints, and threatened to kill Young repeatedly.

At approximately 12:47 a.m., Metro Police transferred Lopez to Defendant Gise's custody in the CJC booking room. Defendant Gise received the arrest report from Young and was aware of Lopez's intoxication. He testified that the arresting officer told him that Lopez could be an assault risk toward staff or other officers.

Defendant Gise testified that Lopez appeared intoxicated, but passive. In searching Lopez, Defendant Gise removed Lopez's handcuffs because, according to Defendant Gise, Lopez "seemed passive" and responded to his questions with "yes, sir" or "no, sir."

At approximately 12:55 a.m., Defendant Gise placed Lopez — then unrestrained — in holding cell No. 2 with Plaintiff. Defendant Gise testified that he put Lopez in the holding cell because he was intoxicated and the arresting officer had problems with Lopez acting out. Plaintiff was the only other person in the holding cell.

3

Defendant Gise did not inform the officer in charge of the turnkey area of any special instructions or concerns regarding Lopez and Plaintiff. The turnkey officer, Dennis McGill, was stationed at a desk approximately ten feet from the holding cell. Defendant Gise then left the area.

3. Assault on Plaintiff

Surveillance video from a camera in the hallway outside the turnkey area shows Lopez in holding cell No. 2, swinging in a downward punching motion beginning at 12:58:46 a.m., less than four minutes after Lopez entered the cell.

At approximately 1:03 a.m., another pretrial detainee, Princess Butler, approached the turnkey desk and reported to McGill and roving Officer Herbert Durham that she saw a man in holding cell No. 2 covered in blood. When the officers entered the cell at 1:03:45 a.m., they saw Plaintiff on the floor, and Lopez standing with his hands against the wall. An ambulance arrived for Plaintiff at 1:19 a.m.

In testimony, Defendant Gise described the scene in Plaintiff's cell as "gruesome" (Doc. No. 68-3 at 53) and stated he was found with a swollen head, split lip and cut face, lying in "a lot of blood." (Doc. No. 68-3 at 37.) According to the Complaint, Plaintiff has suffered traumatic brain injury, dental and facial fractures, cuts, and permanent physical injuries and disfigurement, as a result of the attack. (Doc. No. 1 at 13.) He testified that he has no memory of the evening, beyond going out to bar with his friends. (Doc. No. 68-9 at 4.)

B. *Procedural History*

On April 6, 2011, Plaintiff filed this suit against three DCSO officers in their individual capacities — Defendant Gise and former co-Defendants Dennis McGill and Herbert Durham — and against Defendant Metro, the officers' employer. (Doc. No. 1.) Plaintiff brought claims against all four Defendants under 42 U.S.C. § 1983 ("Section 1983") for violation of his rights under the

4

Fourth and Fourteenth Amendments to the United States Constitution. (*Id.*) In the alternative, Plaintiff brought a claim against Metro under the Tennessee Governmental Tort Liability Act ("TGTLA"). (*Id.*)

In October 2011, Defendant Durham was dismissed from the case after the Court granted his Motion to Dismiss the Section 1983 claim against him. (Doc. No. 35.) In June 2012, Defendant McGill was dismissed following a stipulation by the parties pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii). (Doc. No. 61.)

On July 24, 2012, the remaining defendants — Gise and Metro — filed separate Motions for Summary Judgment (Doc. Nos. 65 [Gise], 70 [Metro]), accompanied by Memoranda in Support (Doc. Nos. 66, 71), a declaration by DCSO Chief Deputy John L. Ford, III (Doc. No. 69), and a Joint Statement of Facts (Doc. No. 68) with ten deposition excerpts as exhibits (Doc. Nos. 68-1 to 68-10). On August 21, 2012, Plaintiff filed a Response to both Motions (Doc. No. 76) with a Statement of Facts (Doc. No. 77), a Response to Defendants' Statement of Facts (Doc. No. 78), and a Notice of Filing with numerous exhibits of incident reports, DCSO policies, and transcript excerpts (Doc. Nos. 80, 80-1 to 80-29). On September 4, 2012, Defendants filed a joint Response to Plaintiff's Statement of Facts (Doc. No. 87) and each filed a Reply (Doc. Nos. 86 [Metro], 88 [Gise]).

With a trial date of December 4, 2012, approaching, Defendant Metro filed a Motion to Ascertain Status or Continue Trial on November 5, 2012, requesting a ruling on both its Motion for Summary Judgment and Defendant Gise's qualified immunity defense. (Doc. No. 91) Defendant Metro states it will evaluate whether to file an interlocutory appeal based on the outcome of these rulings. (*Id.*)

## II.    LEGAL STANDARD

5

Summary judgment is rendered when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must demonstrate that the non-moving party has failed to establish a necessary element of that party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment will be granted if "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, 93 F.3d 230, 233 (6th Cir. 1996). The movant has the initial burden of informing the district court of the basis of the summary judgment motion and identifying portions of the record which lack a genuine issue of material fact to support the non-movant's case. *See Celotex*, 477 U.S. at 323.

The non-moving party may not rest solely on the allegations in the complaint, but must delineate specific evidence that shows there is a genuine issue for trial. *See id.* at 324. A "mere possibility" of a factual dispute is not sufficient to withstand a properly supported motion for summary judgment. *Baird v. NHP Mill Creek Apartments*, 94 F. App'x 328, 330-31 (6th Cir. 2004) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). A dispute about a material fact is genuine if a reasonable factfinder could find for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A party asserting or denying that a fact is genuinely disputed may support its position by (1) citing to particular parts of materials in the record, (2) showing that the materials cited by the opposing party do not establish the absence or presence of a genuine dispute, or (3) showing that an adverse party cannot produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1).

All reasonable inferences are to be drawn in favor of the non-moving party and the evidence of the non-movant is to be believed. *Anderson*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions,

6

not those of a judge . . . on a motion for summary judgment." *Id.* If the court determines that a reasonable factfinder could not find for the non-moving party, summary judgment must be granted. *See Lexington-South Elkhorn Water Dist.*, 93 F.3d at 233.

**III.   ANALYSIS**

Plaintiff has filed federal claims under 42 U.S.C. § 1983 against both Defendants, and a state claim against Defendant Metro. The Court evaluates each in turn.

*A.  Federal Claim: Section 1983*

In his first claim, Plaintiff alleges Defendants have violated his constitutional rights and brings suit under 42 U.S.C. § 1983 ("Section 1983"). Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . [or] suit in equity.

42 U.S.C.A. § 1983 (2010) (West). "The basic requirements of a § 1983 claim include a showing that (1) a person, (2) acting under color of state law, (3) deprived the plaintiff of a federal right." *Berger v. City of Mayfield Heights*, 265 F.3d 399, 405 (6th Cir. 2001). Defendants do not dispute that Defendant Gise acted under color of law at the time of the assault on Plaintiff or that Defendant Metro is not a person under Section 1983; rather, the disputed issue is whether Defendants deprived Plaintiff of a constitutional right.

Plaintiff puts forth three theories of liability here based on a deprivation of his substantive due process rights under the Fourteenth Amendment: (1) deliberate indifference by Defendant Gise, (2) state-created danger, and (3) municipal liability for Defendant Metro. (Doc. No. 76.) The Court addresses each in turn, along with Defendant Gise's affirmative defense of qualified immunity.

1.  <u>Deliberate Indifference</u>

7

Plaintiff alleges Defendant Gise violated his substantive due process rights to be free from inmate-on-inmate violence while in custody because Defendant was deliberately indifferent to the risk of danger to Plaintiff of placing Lopez in a cell with Plaintiff. (Doc. No. 76 18–21.) Defendant Gise argues Plaintiff has failed to meet his burden to establish a substantial risk of harm existed and that Defendant had subjective knowledge of the risk. (Doc. No. 65 at 17–21.)

It is long settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Helling v. McKinney*, 509 U.S. 25 at 31 (1993)). The Eighth Amendment "imposes duties on these officials . . . [to] 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984)); *see also Spencer v. Bouchard*, 449 F.3d 721, 727 (6th Cir. 2006). This includes a duty to "'to protect prisoners from violence at the hands of other prisoners.'" *Farmer*, 511 U.S. at 833 (quoting *Cortes–Quinones v. Jimenez–Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)).

It is also well-established that "pretrial detainees who have not been convicted of any crimes retain, at the very least, the same constitutional rights enjoyed by convicted prisoners," *Barber v. City of Salem*, 953 F.2d 232, 235 (6th Cir. 1992) (citing *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)). "The Eighth Amendment's protections against cruel and unusual punishment extend to pretrial detainees through the Fourteenth Amendment's Due Process Clause, and thus claims by pretrial detainees challenging conditions of confinement are analyzed under the Eighth Amendment." *Brodak v. Nichols*, 162 F.3d 1161 (6th Cir. 1998) (table opinion); s*ee also Barber*, 953 F.2d at 235.

To succeed, a pretrial detainee's conditions-of-confinement claim under the Due Process Clause must satisfy two elements: "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" *Farmer*, 511 U.S. at 834 (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "Second,

8

the prison official's 'state of mind [must be] one of deliberate indifference' to inmate health or safety." *Spencer*, 449 F.3d at 728 (citing *Farmer*, 511 U.S. at 834).

a. Objective, Substantial Risk of Harm

The Court finds the Plaintiff has offered sufficient evidence regarding a genuine dispute of fact that an objectively serious and substantial risk to his health and safety existed, based on the circumstances of his condition and Lopez's state.

"To establish a constitutional violation based on failure to protect, a prison inmate first must show that the failure to protect from risk of harm is objectively 'sufficiently serious' and that 'he is incarcerated under conditions posing a substantial risk of serious harm.'" *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (quoting *Farmer*, 511 U.S. at 833).

Here, Plaintiff has offered evidence that Police arrested and attempted to book Plaintiff while he was in an intoxicated state, "[c]ussing, actively resisting, trying to pull away from [officers], [and] threatening officers." (Doc. No. 68-3 at 5.) In fact, Defendant Gise stated in his deposition that he segregated Plaintiff because Plaintiff posed a risk of starting a fight with other inmates. (Doc. No. 80-3 at 5–6.) That is, there was a known and serious enough risk that Plaintiff would engage in an altercation that warranted his segregation from others.

For his part, Lopez was also too intoxicated to be booked immediately and to be detained in the open turnkey area. He entered the facility after having been arrested for, among other things, resisting arrest (Doc. No. 68-5 at 10), and had acted erratically and violently throughout the car-ride to the holding facility (Doc. No. 68-5 at 6–9). During the ride, Lopez repeatedly threatened to kill the arresting officer, and attempted to shatter the car window several times with his feet, requiring extra restraints. (*Id.*)

9

In sum, both men were too drunk and belligerent to cooperate at intake; Plaintiff had demonstrated behavior that made jail staff believe he would agitate others, while Lopez had acted violently and had threatened to hurt others. And both men were placed in a holding cell together, hands unrestrained. The Court finds these factual allegations, taken in the light most favorable to Plaintiff, are sufficient for a reasonable jury to conclude there was a substantial risk of harm to Plaintiff in placing Lopez in the cell with him.

### b. Defendant Gise's State of Mind

Plaintiff has also shown a genuine dispute of material fact regarding the second element to the conditions-of-confinement claim, as a reasonable jury could find that Defendant Gise was "deliberately indifferent" to the substantial risk of harm to Plaintiff in grouping him and Lopez in the holding cell together without adequate supervision. While Defendant argues that he was unaware of the risks and there are no facts that would lead to infer his subjective knowledge of the risks, Plaintiff points to key circumstantial facts that could lead a reasonable jury to find that Defendant did have the requisite knowledge.

To meet the second element of failure to protect claim, a pretrial detainee "must show that prison officials acted with 'deliberate indifference' to inmate health or safety." *Bishop*, 636 F.3d at 766. Deliberate indifference requires a culpable mind that lies between negligence and purposeful, knowing conduct. *Farmer*, 511 U.S. at 836. In considering this element, the Sixth Circuit "has emphasized that a plaintiff must produce evidence showing 'that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk.'" *Perez v. Oakland Cnty.*, 466 F.3d 416, 424 (6th Cir. 2006) (citing *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir.2001)). This subjective knowledge may be "demonstrat[ed] in the usual ways, including inference from circumstantial

10

evidence . . . [or] the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. For a claim based on a failure to protect from other inmates, this may include "subjective[] awareness of plaintiff's vulnerability to attacks or the abuse that he alleges he was suffering." *Bishop*, 636 F.3d at 768.

By contrast, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. Thus to escape liability, prison officials "might show . . . that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of the danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844.

While the overall "legal standard for deliberate indifference is a question of law," the issue of a deputy's subjective "knowledge and conduct are questions of fact." *Bishop*, 636 F.3d at 764; *Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact.").

Defendant Gise made two decisions relevant to the deliberate indifference analysis: first to place Plaintiff in isolation in holding cell No. 2, and then to add Lopez to holding cell No. 2. Plaintiff does not challenge the reasonableness of the first decision (Doc. No. 76 at 17), instead, he bases his claims on Defendant Gise's decision to place an unrestrained, intoxicated, and previously violent Lopez in holding cell No. 2 with another intoxicated and uncooperative detainee, and then, as Plaintiff alleges, to "simply walk[] away." (Doc. No. 76 at 18–21.)

Defendant claims Plaintiff has failed to meet this second element of *Farmer* because there is no evidence of his subjective knowledge: Defendant testified in his deposition that he did not

11

perceive a risk, that he thought both inmates were at the same level intoxication and cooperation, and that he thought Plaintiff would sleep off his intoxication.  (Doc. No. 88 at 5.)  Defendant also claims there is no evidence that would have lead him to believe a substantial risk of harm existed, as Lopez was not aggressive in the intake process, not threatening other inmates, and not arrested for a violent crime.  (*Id.*)

Here, the Court finds that Plaintiff has shown evidence to raise genuine disputes of material fact regarding Defendant Gise's subjective knowledge that belong before a jury.  Key to Defendant Gise's defense that he had no subjective knowledge of the risk of harm presented to Plaintiffs are two facts: that Defendant believed Lopez to be "passive," and that he believed Plaintiff was sleeping off his intoxication.  Facts and statements in the record appear to contradict Defendant's conclusions on both points, raising issues of fact for the jury to weigh.

First, there is ample evidence that Defendant Gise knew Lopez was severely agitated at the time he arrived at the jail, and that Lopez presented a risk of harm to others at intake and in the future.  Defendant Gise stated in his deposition testimony that, in assessing the risks posed by inmates during booking, he looks to (1) their appearance, (2) their behavior *leading up to* intake and at intake, and (3) their charges, but that only their behavior or potential behavior dictates whether they will be placed in a holding cell.  (Doc. No. 68-3 at 33, 43.)  Leading up to intake, Lopez had engaged in both verbally assaultive behavior (threats to kill Officer Young and others) and physical violence (twice attempting to kick out the window of the car, escaping from foot restraints, banging his head "hard" repeatedly against the screen separating the driver from the passenger in back).  (Doc. No. 68-5 at 6–9.)  Young testified in his deposition that he gave the jail advance notice of Lopez's state, calling his dispatcher after Lopez "had slipped the restraints" and "advis[ing] them that I had an unruly prisoner and I was requesting some assistance when we got to the sheriff's

department." (Doc. No. 68-5 at 9.) Defendant Gise admits that he was briefed on the arrest by Officer Young at intake and that he read the arrest report when Lopez was brought in. (Doc. Nos. 68-3 at 24, 80-13 at 13–14.) He recalled that Young told him "that [Young] had problems with [Lopez] acting out." (Doc. No. 68-3 at 35.)

A reasonable jury could find that the severity of these threats and violence — and the fact arrest behavior was one of only three factors Defendant Gise used to assess an inmate's risk — contradict Defendant Gise's testimony that Lopez "didn't give me pause to think that he would try and assault me" (Doc. No. 68-3 at 26).

Defendant Gise himself suggests that he had come to the conclusion that Lopez was still a risk to others. Defendant states both "arrestees . . . would not cooperate with the booking and intake process" and for this reason he placed both Lopez and Plaintiff in isolation in a holding cell before completing booking. (Doc. No. 88 at 3.) Defendant also assessed Lopez as "lower middle class, probably a laborer," which he testified was relevant in a risk assessment because "an arrest is a traumatic event for them." (Doc. No. 68-3 at 22.)

Most significantly, Defendant Gise testified in his deposition that, in his experience, the threat level and assaultive behavior of intoxicated inmates "flip flops," and for this reason he placed Lopez in a holding cell. (Doc. No. 68-3 at 32, 35.) *See Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (facts raised by plaintiff to show warden's subjective knowledge included his "admission that the universe of harm that can befall inmates like [plaintiff] includes" the acts committed by another inmate). When asked in deposition why Lopez was put in a holding cell when it appeared he had become "passive" at intake, Defendant Gise stated: "Because he was intoxicated, and with intoxicated people *their behavior tends to flip flop from one extreme to another*." (Doc No. 68-3 at 32.) While reviewing video footage of Lopez, Defendant Gise testified, "We're putting him in the

13

holding cell because he's intoxicated, and in my experience people tend to flip flop between being passive and being assaultive." (Doc No. 68-3 at 35.)

In summary, Defendant Gise testified that he was aware of Lopez's assaultive and violent behavior before intake, generally took this behavior into account in assessing the risk of harm posed by an inmate, and decided to place Lopez in a holding cell as a protective measure in case Lopez "flip flopped" back to "being assaultive." Based on these facts, a reasonable jury could find that Defendant Gise himself inferred that Lopez presented a substantial risk of injury to others before and at booking, and that he presented a continued risk of violence to others, including other detainees such as Plaintiff.

Second, by Defendant Gise's own admission, he believed there was a risk that Plaintiff could instigate a fight with other inmates, and from this assessment of the risk, chose to segregate Plaintiff. Responding affirmatively to a question of whether he believed Plaintiff "could be a threat to himself or to others . . . whether arrested detainees or correctional officers" had Plaintiff been detained in the open turnkey area, Defendant Gise stated:

> Also, I also felt that he—*more of the concern that he would create a disturbance* by acting out and yelling. Less of it being assaultive, but by creating a disturbance, *it would lead to other inmates to become upset with him, and then you'd have a fight.*

(Doc. No. 80-13 at 5–6) (emphasis added). Defendant contends that he believed this risk had dissipated when he placed Lopez in the same holding cell, as "[Plaintiff] was passed out asleep, which kind of gives me the impression the alcohol has taken its toll and he's going to sleep it off." (Doc. No. 68-3 at 41.)

However, Plaintiff alleges that he was not asleep when Defendant Gise placed Lopez in his cell, and video evidence shows Plaintiff awake and standing at the door of his cell within one minute of Defendant Gise leaving Lopez in the cell at 12:55:45 a.m. (Doc. No. 76 at 18.)

14

Surveillance video clearly shows Plaintiff at the cell door, facing the turnkey desk continuously for more than one minute and a half from 12:56:44 a.m. to 12:58:20 a.m., during which time Defendant Gise was mostly standing at the turnkey desk, actually facing Holding Cell No. 2 and Plaintiff at the door.  (Plaintiff Video Exhibits H and I.)  Twenty-six seconds later, video shows Lopez punching in a downward motion where Plaintiff was found beaten.

Plaintiff also points to a statement made by Lopez to the jail's Chief of Security, Jamie S. Johnson, Jr., who conducted an administrative investigation into the beating, in which Lopez stated that Plaintiff was awake and yelling at the time Lopez entered the cell.  (Doc. No. 76 at 7, 19.)  Johnson reported:

> Gonzalez[2] recalls going into the holding and hearing Dressman yelling at the guards.  Gonzalez states he told Dressman to shut up, however, according to Gonzalez, Dressman continued yelling.  Gonzalez states that he then began to punch and kick Dressman.

(Doc. No. 80-4 at 2.)  According to Johnson's memorandum, Lopez ("Gonzalez") made this statement to the investigator on April 26, 2010, within twenty-four to forty-eight hours of the assault.  (Doc. No. 80-4 at 2.)[3]

In addition, a deposition excerpt provided to the Court includes a statement by Princess Butler — the inmate who reported to Officers McGill and Durham seeing Lopez with bloody hands — that could be construed as further evidence supporting Lopez's explanation that Plaintiff was awake and yelling at the guards.  Asked why the turnkey officers did not notice that Plaintiff had

---

[2] In his memorandum describing DCSO's investigation of the assault, Johnson mistakenly refers to Lopez as "Gonzalez," Lopez's middle name.  (Doc. No. 80-4.)

[3] By comparison, Defendant Gise's testimony that Plaintiff was asleep was taken on February 16, 2012, almost two years after the incident (Doc. No. 68-3 at 1) and does not appear to be based on his incident report, which makes no mention of the Plaintiff's state when Lopez entered the cell (Doc. No. 68-3 at 60–63).

15

been assaulted, Butler testified, "I guess they had figured that he was probably just *still hollering*, but it was that other man that they brought in there that he was beating on him, and he was covered in blood." (Doc. No. 68-8 at 3) (emphasis added).

Lastly, Johnson's report on his investigation includes Officer McGill's — the officer seated at the turnkey desk ten feet from the holding cell — recollection of the incident, which is ambiguous as to whether Plaintiff was asleep or still awake:

> Curtis Dressman was in holding cell #2, intoxicated hitting and kicking on the cell door. Dressman did this a few times then quieted down. Sgt. Gise placed another inmate in the holding cell with Dressman, because he was also intoxicated.

(Doc. No. 80-4 at 3.) McGill's statement was also taken on April 26, 2010. (Doc. No. 80-4 at 3.)

In sum, there are video evidence and statements made soon after the assault from multiple sources that indicate Plaintiff was awake, yelling and agitated immediately before the beating, which occurred approximately three minutes after Lopez entered the cell. Construing this evidence in favor of Plaintiff, there is strong evidence that Defendant Gise knew his earlier assessment of Plaintiff — that Plaintiff might instigate a fight — continued to be true when Defendant placed Lopez into holding cell No. 2. Not only do the facts above add to the universe of perceived facts that could establish Defendant Gise had subjective knowledge of the risks to Plaintiff, but — because some facts directly contradict parts of his testimony — they could also undermine the credibility of Defendant Gise's statements before a jury.

In addition to the facts relating to that evening, Plaintiff has put forth evidence that the jail had a known problem of inmate-on-inmate violence, based on thirty-four reported incidents of such assaults in the intake or turnkey area in the four years before the incident at issue here.[4] (Doc. No.

---

[4] The Court notes that Plaintiff alleged in his Complaint that "offender/offender assaults" occurred "almost one per day." (Doc. No. 1 at 10.)

16

76 at 19–20.)  Plaintiff alleges that "[m]ost of the attacks involved intoxicated arrestees and/or arrestees that were housed in a holding cell together" (Doc. Nos. 76 at 19, 80-2), and that Defendant Gise himself signed incident reports for four of these assaults in the four months leading to the attack on Plaintiff (Doc. Nos. 80-6 to 80-9).  Defendant does not dispute these facts, but seeks to minimize the prior incidents by stating that Plaintiff has not alleged these incidents were similar to the assault of Plaintiff or that any resulted in serious harm.  (Doc. No. 88 at 5.)  Again, these circumstantial facts could lead a reasonable jury to find Defendant Gise had subjective knowledge of the risk of harm to Plaintiff.

Finally, as evidence that Defendant Gise disregarded the known risk of harm, Plaintiff's expert highlights the fact that Defendant Gise made "no effort . . . to reassess Dressman's condition" before placing Lopez in the cell (Doc. Nos. 76 at 18, n.6, 120-1 at 10).  Plaintiff also argues that Defendant violated internal DCSO policies by not seeking approval before placing the detainees in isolation, not asking the turnkey officer to monitor holding cell No. 2, and not logging any information about the detainees in the turnkey area logbooks.  (Doc. No. 76 at 18)  Plaintiff, through his expert witness, claims that placing two intoxicated inmates together creates a duty for officers to monitor the inmates.  (Doc. No. 80-3 at 2–3.)  By failing to monitor Plaintiff after placing him in the cell, and again after introducing Lopez, Plaintiff claims Defendant Gise ignored known safety risk twice.  (Doc. No. 76 at 21, n.8.)

All together, these facts could, under the Sixth Circuit's precedent, lead a reasonable jury to find that Defendant Gise perceived facts from which to infer substantial risk to Plaintiff, that he did in fact draw the inference, and that he then disregarded that risk.

2.  <u>State-Created Danger Theory</u>

17

Plaintiff presents a second claim against Defendants under Section 1983, based on the state-created danger theory of liability, arguing that Defendants are liable for Lopez's actions because Defendants created the risk of harm to Plaintiff by placing Lopez in the holding cell with him. However, Defendants jointly respond that this theory of liability does not apply in a custodial setting. (Doc. Nos. 86 at 1–2, 88 at 7.) We find Defendants' position to be correct as a matter of law.

The Supreme Court in *DeShaney v. Winnebago County of Social Services*, 489 U.S. 189 (1989), launched the constitutional "state-created danger" theory of liability when it recognized that the Due Process Clauses "impose[] an affirmative duty to protect an individual from private acts of violence" when (1) a "special relationship" existed between the state and individual, "such as when the state takes someone into custody," or (2) in "the absence of a special relationship," the state played a part in the creation of the risk or did something to render the individual more vulnerable to the risk. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998) (citing *DeShaney*, 489 U.S. at 199–201); *see also Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008) ("A governmental actor may, however, violate the due process clause by allowing a third party to harm a person in government custody, or by creating a particular danger to the victim."); *Stemler v. City of Florence*, 126 F.3d 856, 868 (6th Cir. 1997) ("A number of courts have relied on [*DeShaney*'s] language to hold that the state may owe an individual a duty of care under substantive due process, even if the individual is not in the state's custody, if the state has created a risk of harm to the individual.").

While Plaintiff seeks to establish a "state-created danger" claim based on his substantive due process rights, this precedent holds that, in the custodial setting, these due process rights are already vested in his deliberate indifference claim. As the *DeShaney* Court explained, substantive due

18

process rights in custodial settings derive not from the state's "failure to act to protect [an inmate's] liberty interests against harms inflicted by other means" (i.e., third parties), but that "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf . . . which is the 'deprivation of liberty' triggering the protections of the Due Process Clause." 489 U.S. at 200.

The Court is not persuaded by Plaintiff's interpretation of *Stemler*, 126 F.3d at 867, for the proposition that a state-created-danger theory applies in a custodial setting. (Doc. No. 76 at 12.) Plaintiff claims the Sixth Circuit in *Stemler* held this theory applies in custodial settings when (1) there is a sufficiently direct relationship between the state and plaintiff, and (2) the officers are sufficiently culpable. (*Id.*) However, *Stemler* made clear this two-part test for substantive due process rights in custodial settings — a formulation of the deliberate indifference standard — was distinct from the then newly formed state-created-danger theory, which applied in non-custodial settings. 126 F. 3d at 867–89. It was an error for Plaintiff to collapse these distinct theories together in his synthesis of the law. Thus, the Court finds Plaintiff has not established a claim for liability under a state-created danger theory.

3. <u>Qualified Immunity</u>

Defendant Gise raises the affirmative defense of qualified immunity, claiming that he should be immune from suit because Plaintiff has failed to show that placing Lopez and Plaintiff in a cell together violates a clearly established right (Doc. No. 88 at 1–4), and "because his actions were objectively reasonable under the circumstances" (Doc. No. 65 at 21). The Court addresses each argument in turn, mindful that Plaintiff bears the "burden to prove that the [Metro] officials are not entitled to qualified immunity." *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006) (citing *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000)).

a. Clearly Established Constitutional Right

19

The Court finds Plaintiff has met his burden to show Defendant Gise violated a clearly established right of pretrial detainees to be free from inmate-on-inmate violence. *See Bishop*, 636 F.3d at 766. Under the qualified immunity doctrine, "[g]overnment officials, including police officers, are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Jefferson v. Lewis*, 594 F.3d 454, 459 (6th Cir. 2010) (citing *Hills v. Kentucky*, 457 F.3d 583, 587 (6th Cir. 2006)).[5] In other words, a "defendant enjoys qualified immunity on summary judgment unless the facts alleged and evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established [at the time of the violation]." *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009) (citing *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Perez*, 466 F.3d at 427 (citing *Saucier v. Katz*, 533 U.S. 194, 201–2 (2001)). *See also McCloud v. Testa*, 97 F.3d 1536, 1541 (6th Cir. 1996) (plaintiff "must establish that [defendant's] conduct violated a federal right so clearly established that any official in his position would have understood that he was under an affirmative duty to refrain from such conduct.")

Here, the Court finds that, under a line of cases cited below, Plaintiff has a clearly established constitutional right to be from deliberate indifference of inmate-on-inmate violence;

[5] Plaintiff also argues that Defendant Gise's actions relating to both detainees were not discretionary and were in violation of several DCSO policies requiring written approval from supervisors and the tracking of information in various logs and databases. (Doc. No. 76 at 16–17.) As it is not necessary to reach our conclusion, the Court does not address the issue of whether Defendant Gise's actions were discretionary.

these cases also put Defendant Gise on notice at the time of the assault that he had an obligation to protect detainees from this violence. *See e.g.*, *Farmer*, 511 U.S. at 833; *Leary v. Livingston Cnty.*, 528 F.3d 438, 442 (6th Cir. 2008); *Greene*, 361 F.3d 290.

In a recent case of inmate-on-inmate sexual abuse at a Michigan jail where inmates were held in a 12-person unit, the Sixth Circuit made clear that "the constitutional right to be free from deliberate indifference to assault . . . was clearly established" by December 2004, asserting simply that "on several occasions we have recognized an inmate's right to be free from prison violence as clearly established." *Bishop*, 636 F.3d at 766 (citing *Leary*, 528 F.3d at 442) (noting that the right to be free from violence at the hands of other prisoners is clearly established); *Doe v. Bowles*, 254 F.3d 617, 620 (6th Cir. 2001) ("The right of an inmate to be protected from an attack by a fellow inmate was well established at the time the events in question took place."); *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990) ("On several occasions, we have held that 'deliberate indifference' of constitutional magnitude may occur when prison guards fail to protect one inmate from an attack by another. . . .")).

Nonetheless, Defendant maintains that Plaintiff has not shown his rights were clearly established because "Plaintiff has pointed out no controlling or persuasive authority holding that it was unconstitutional to temporarily place two non-compliant arrestees in a single holding cell until they became able to cooperate in the booking process." (Doc. No. 88 at 2.) However, this is not what is required to meet the "clearly established" standard.

"Clearly established," in the Section 1983 context, "does not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). For a right to be clearly established,

> [t]he contours of the right must be sufficiently clear that a reasonable official
> would understand that what he is doing violates that right. *This is not to say*

21

*that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful*, but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (emphasis added).

In other words, "'there need not be a case with the exact same fact pattern, or even "fundamentally similar" or "materially similar" facts,'" so long as the plaintiff can show "a *generally applicable principle* from either binding or persuasive authorities" that would have put the officer on notice. *Perez*, 466 F.3d at 429 (internal citations omitted) (emphasis added).

Here, notice to Defendant that Plaintiff had a right to be free of deliberate indifference to assault by another inmate is sufficient.[6] *See Bishop*, 636 F.3d at 766. In *Leary*, the Sixth Circuit affirmed the district court's denial of qualified immunity in a suit by a pretrial detainee who claimed, among other claims, that an officer at the jail was deliberately indifferent to the risk of harm of inmate-on-inmate violence when the officer told other inmates that plaintiff had raped a minor. 528 F.3d at 441–42. The Sixth Circuit rejected the officer's argument that the detainee failed to show a clearly established right because "[T]here is no clearly established law prohibiting a jail officer from talking to an inmate about another's charge." *Id.* at 442 (citation omitted). Rather than following the officer's tack to parse the clearly established right down to the specific action at issue in the case, the court held the plaintiff "ha[d] shown that the right [to be free from deliberate indifference] was clearly established," quoting *Farmer*'s statement that "prison officials have a duty

---

[6] In this case, Plaintiff presents evidence that Plaintiff had actual notice of this right. Evidence from interrogatories established that Gise attended a training course titled "Supervisor – Deliberate Indifference." (Doc. No. 76 at 24.) And additional evidence showed officers at the jail received a presentation on use of force that included two slides explaining that officers have a heightened duty of care "[w]hen we have someone in our custody or control," and that they have a legal duty to protect inmates from other inmates. (*Id.*)

22

. . . to protect prisoners from violence at the hands of other prisoners." *Id.* at 442 (citing *Farmer*, 511 U.S. at 833).

Similarly here, because the "generally applicable principle" from these inmate-on-inmate violence cases — that an officer may not be deliberately indifferent to a substantial risk of harm to detainees in his custody — applies equally when the risk arises from the act of placing the detainee in a holding cell as when the officer commits other acts, the Court finds that Plaintiff has met his burden to establish a clearly established constitutional right.

### b. Reasonableness

Defendant also states he is entitled to qualified immunity "because his actions were objectively reasonable under the circumstances." (Doc. No. 65 at 21–22; Doc. No. 88 at 3–4.)

Officials may receive immunity "'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005) (quoting *Anderson*, 483 U.S. at 638). In other words, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson*, 483 U.S. at 639 (internal citations omitted).

As detailed at length above, the Court finds that Plaintiff has established sufficient circumstantial facts relating to the two detainees' intakes, such that a jury could find the Defendant Gise's actions were unreasonable in light of Defendant's then-established duty to protect Plaintiff from inmate-on-inmate violence. Plaintiff has offered evidence that an officer in Defendant Gise's position would know Lopez was physically violent and had threatened to kill his arresting officer repeatedly before arriving at the jail. (Doc. No. 68-5 at 6–9.) Lopez was still intoxicated and

23

deemed sufficiently uncooperative at intake to be placed in a holding cell. (Doc. No. 88 at 3.) Plaintiff has also shown that he was intoxicated and belligerent at intake, and awake and agitated at or near the time Defendant Gise placed Lopez in holding cell No. 2. (Doc. No. 80-4.) Plaintiff has alleged these facts would be viewed by an officer in the context of a known history of inmate-on-inmate violence at the jail. (Doc. No. 76 at 19–20.)

Lastly, Plaintiff has offered evidence to show that at the time Defendant Gise placed Lopez in holding cell No. 2, there were empty holding cells available for Defendant to use to segregate Lopez from Plaintiff and other detainees. (Doc. Nos. 76 at 19–21; 120-1 at 10; 68-3 at 35–36.) Plaintiff alleges "[t]here was no compelling need [for] Sergeant Gise to put Lopez in holding cell No. 2 with Dressman" because "[t]here were three and possibly four empty holding cells available" (Doc No. 76 at 21), two unoccupied holding cells in the holding area room and another two unoccupied holding cells in the hallway. (Doc. No. 1 at 5–6.) This contrasts sharply with Defendant Gise's testimony that no other holding cells were available at the time that he placed Lopez in Plaintiff's cell. (Doc. No. 68-3 at 35.) Construing the evidence in Plaintiff's favor, a reasonable jury could find this fact undermines Defendant Gise's claim that his decision to group the two knowingly drunk and belligerent men was reasonable in light of the circumstances.

The Court thus finds these facts together do not establish that Defendant Gise's actions were "objectively reasonable" as a matter of law, and, for the reasons above, qualified immunity is inappropriate. Thus, Defendant Gise's Motion for Summary Judgment (Doc. No. 65) is **DENIED**.

4. <u>Municipal Liability under Section 1983</u>

In addition to claims against Defendant Gise, Plaintiff also seeks to hold Defendant Metro liable for practices that Plaintiff claims directly resulted in his injury. Under Section 1983, Municipalities may not be held vicariously liable for the actions of their employees or agents.

24

*Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). However, they can be found liable when their own customs or policies are the "moving force" behind a constitutional violation. *Id.* at 690–691. Thus, to succeed on his municipal liability claim, Plaintiff must demonstrate: (1) the deprivation of a constitutional right, and (2) that Defendant Metro is responsible for the deprivation through its customs or policies. *Doe v. Claiborne Cnty.*, 103 F.3d 495, 505–06 (6th Cir. 1996).

A plaintiff has several methods to prove the existence of a municipality's policies or customs. "The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citations omitted).

In his Complaint, Plaintiff alleges several customs or practices that he asserts were the moving force behind the deprivation of his constitutional rights. (Doc. No. 1 at 9–12.) These can be grouped into three allegations: a practice of intake detainee isolation that does not segregate violent or special-needs pretrial detainees; a failure to train or supervise officers; and a failure to enforce medical screenings. (*Id.*) The Court addresses each in turn.

a. Practice of Isolation

Plaintiff alleges Defendant Metro had a policy to screen and segregate prisoners with violent tendencies or special needs, but that it did not have such a policy for pretrial detainees, relying instead on a "longstanding unwritten practice of isolation" that caused Plaintiff's injuries. (Doc. No. 76 at 25–26.) Defendant Metro responds that Plaintiff has failed to show that Metro's isolation practice was either deliberately indifferent or that it caused Plaintiff's injury, noting that Plaintiff's

25

expert testified that every jail has a practice of removing noncompliant arrestees from the booking process. (Doc. No. 86 at 3.)

Where no formal policy exists, the critical inquiry is whether there is a policy or custom that, even if not explicitly authorized, "is so permanent and well settled as to constitute a custom or usage with the force of law." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 946 (6th Cir. 2010) (citations omitted). *See Monell*, 436 U.S. at 691, 695 (a custom or practice is based on "persistent and widespread . . . practices of state officials" whose "edicts or acts may fairly be said to represent official policy"). Unlike a governmental policy, a governmental custom does not need to receive formal approval by government decisionmakers to be attributable to a municipality. *Id.* at 691. Typically, once a plaintiff has identified a custom, he or she "'must also show a direct causal link between the custom and the constitutional deprivation,'" in order "to avoid [imposing] de facto *respondeat superior* liability prohibited by *Monell*." *Cash v. Hamilton Cnty. Dep't of Adult Prob.*, 388 F.3d 539, 543 (6th Cir. 2004) (quoting *Doe*, 103 F.3d at 508).

Under an "inaction theory" of municipal liability — in which a plaintiff alleges "liability should attach by virtue of prevailing custom within the municipality, namely, institutional inaction in the face of violations of substantive due process rights" — the Sixth Circuit has held a plaintiff must also establish deliberate indifference of the municipality. *Miller v. Calhoun Cnty.*, 408 F.3d 803, 815 (6th Cir. 2005).[7] Under this theory, Plaintiff must establish the following: (1) the

---

[7] Plaintiff appears not to challenge Defendants' characterization of his isolation-practice claim as a "failure to act" claim that must meet the "inaction theory" standard of liability. The Court notes that Plaintiff does not strictly allege inaction, but has stated an affirmative custom and practice of isolation that he asserts caused his deprivation of constitutional rights. Though styled as a "failure to protect" custom in his Complaint (Doc. No. 1 at 11), this custom was re-framed in Plaintiff's subsequent briefing (Doc. No. 76 at 15, 25–26). Nonetheless, because the Court finds Plaintiff has offered sufficient evidence to withstand summary judgment on the heightened deliberate indifference standard, it applies this standard here.

26

existence of a clear and persistent pattern of unconstitutional or illegal action; (2) notice or constructive notice on the part of the County; (3) the County's tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and (4) that the County's custom was the "moving force" or direct causal link in the constitutional deprivation. *Thomas*, 398 F.3d at 429 (citing *Doe*, 103 F.3d at 508); *see also Miller,* 408 F.3d at 815.

Here, the Court finds that Plaintiff has established a genuine dispute of material fact as to whether Metro's custom and practice of "isolation" violated Plaintiff's constitutional rights. First, the Court finds that Plaintiff has offered sufficient evidence that there was a clear and persistent pattern of illegal activity in the jail. Plaintiff has introduced evidence, based on incident reports, of thirty-four inmate-on-inmate assaults involving detainees in the turnkey area and holding cells in the four years before the attack on Plaintiff. (Doc. No. 80-5.) *See Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989) (affirming district court's finding that fourteen prior incidents put a sheriff on notice for deliberate indifference analysis). According to Plaintiff's summary of the records, the majority of these involved assaults between intoxicated inmates. (Doc. Nos. 76 at 19, 80-5.) In addition, the last four of such incidents before the assault on Plaintiff occurred during Defendant Gise's shifts in the four months preceding the assault. (Doc. No. 80-5.) And, of the fourteen incidents in the twelve months before the incident at issue, nine were identified as taking place in holding cells that appear to have contained more than one inmate. (Doc. Nos. 80-5, 80-7.) For instance, in an incident two months before the assault on Plaintiff, one of two inmates in holding cell No. 2 "stould [sic] on the beach [sic] and stomped [the other inmate] in the head so he could get moved to a holding cell by himself," according to the incident report prepared by Defendant Gise. (Doc. No. 80-7.) Even if this evidence does not establish that the CJC's inmate-

27

on-inmate attacks were the result of unconstitutional actions by its officers, the Court construes the evidence in the light most favorable to Plaintiff. This is particularly necessary where evidence may be lacking as to all the details of the assaults, as CJC Administrator Austin Bodie suggested when he testified in his deposition that the jail "do[es]n't typically investigate inmate assaults" beyond routine incident reports. (Doc. No. 80-10 at 2.)

Nonetheless, Defendant Metro argues that Plaintiff has not established these incidents are widespread, citing data that "assault incidents in the booking area occurred at a rate of 1-2 out of every 10,000 bookings," a number that Plaintiff's expert testified was comparable to another jail of DCSO's size. (Doc. No. 86 at 6–7.) This does not change the Court's conclusion that Plaintiff has shown sufficient evidence, as a matter of law, to create a genuine dispute of material fact. Rather, the Court believes this type of dispute over the significance of the data is appropriate for a jury to decide.

Second, Plaintiff has shown sufficient evidence that DCSO administrators were on notice of the prevalence of inmate-on-inmate assaults. DCSO Chief of Corrections, Tony Wilkes, testified that, while neither he nor any of his associates reviewed quarterly or yearly summaries of inmate-on-inmate assaults in the booking area, he was aware of them. (Doc. No. 80-18 at 7–9, 11–12.) In addition, he testified that supervisors and the chief of security "signed off" on individual incident reports. (Doc. No. 80-18 at 6–7, 14.)

Third, the Court finds that Plaintiff has offered sufficient evidence showing that CJC had an unwritten and discretionary practice of isolating multiple arrestees in turnkey holding cells during the booking process, despite the occurrence of inmate-on-inmate violence. The discretionary nature of this practice was confirmed by Chief of Corrections Wilkes, who testified that in his "25 years of experience, the practice has been" for a booking or turnkey officer and sergeant to isolate detainees

who demonstrate noncompliant behavior at booking.  (Doc. No. 80-17 at 4–5.)  Wilkes testified, "I can't say there is a particular policy or a standard operating procedure or post order that . . . goes in and describes those steps."  (*Id.* at 4.)  Asked, for instance, how long arrestees can be held in a holding cell in isolation before an officer determines the person can return to booking, Wilkes stated, "There's no set time frame."  (*Id.* at 3.)

Officer Jones, who had worked in DCSO booking department for fourteen years at the time he was deposed, also testified that booking officers had the authority to place arrestees in "isolation" in a turnkey holding cell for an indefinite period of time not prescribed by any department policies or procedures.  (Doc. No. 80-16 at 3–8.)  He also testified that isolation was an alternative to the department's "Tap Out" procedure (Doc. No. 80-16 at 3), which — as explained by a supervisor in the department — is the final measure taken with unruly arrestees that requires approval of a non-uniformed supervisor and requires that the detainee's movements be tracked in the jail's record-keeping system (Doc. Nos. 80-15 at 3–5, 80-23).  By contrast, Officer McGill testified that, as the turnkey officer, he did not keep a log or any records for intake detainees placed in isolation (Doc. No. 80-12 at 2), and as a matter of "routine," he might not know an intake detainee's name or why he was placed in a holding cell (Doc. No. 68-6 at 6).

Plaintiff has also shown sufficient evidence to show that, in 2010, Metro's practice of isolation allowed for housing multiple arrestees in one cell and did not require segregating detainees with special needs, demonstrated violent behavior, or violence-related arrests.  Defendant Gise stated at deposition that the practice was simply to "match" the detainees into cells together based on intoxication and compliance levels at the time of booking.  (Doc. No. 68-3 at 55–56.)  Thus, an intoxicated detainee with a history of physically violent behavior, such as Lopez, could be placed in a cell with another intoxicated detainee if he was "coming down" from the peak of his intoxication.

29

(Doc. No. 68-3 at 55–56.)  Defendant Gise also testified that, at this stage in the process, the booking officers would not necessarily know whether the arrestee had an arrest record for violent arrests (*id.* at 34), but would have information about the arrest that placed the person in DCSO custody (*id.* at 42–43).  Jones testified that, following Plaintiff's assault, DCSO changed its isolation practices to require that intake detainees be isolated alone in holding cells, rather than with other detainees.  (Doc. No. 80-16 at 5–6.)

Fourth, the Court finds Plaintiff has offered sufficient evidence to show a genuine dispute as to whether Defendant Metro's practice of isolation, as practiced by the CJC in 2010, caused Plaintiff's injury.  Plaintiff asserts that "but for" Defendant Gise's use of the isolation practice to place Lopez into his cell, Plaintiff would not have suffered his injury.  (Doc. No. 76 at 26.)  In other words, Defendant's practice of placing intake detainees who had demonstrated assaultive behavior into holding cells with other detainees caused the assault on Plaintiff.  Plaintiff's expert suggests that, had DCSO's custom of isolation contained specific standards, the officers could have prevented the assault.  For instance, Defendant Gise could have placed each detainee in an individual cell based on his assaultive behavior, or could have re-assessed Plaintiff's condition at certain benchmarks to determine if a less restrictive means of detaining him was available.  (Doc. No. 120-1 at 10.)

Nonetheless, Defendant Metro claims there was no causal link between its practices and the assault because "Plaintiff and Lopez were not locked in a room far away from any corrections officers" and out of their sight.  (Doc. No. 86 at 5–6.)  Metro argues, based on McGill's testimony, that the turnkey officer sees when inmates are placed in holding cells by booking officers, conducts observation rounds in accordance with DCSO policy, and "[f]rom his desk, . . . can hear if someone if [sic] screaming in the holding cell."  (Doc. No. 86 at 6.)  Officer McGill, Metro argues, "was,

unfortunately, turned and looking away when the assault [on Plaintiff] began." (Doc. No. 86 at 6.) Thus, the assault was simply a "horrible, random act of violence" that could not have been stopped under any policy. (Doc. No. 86 at 6.)

This "the assault was inevitable" argument minimizes the stark circumstances of the assault, which could lead a reasonable jury to conclude Defendant Metro's policy was causally linked to the assault. The surveillance video shows Lopez punching in a downward motion in the camera's line of sight at 12:56:46 a.m. and continuing to punch almost without pause for one minute (until 12:59:39 a.m.). The video then shows Lopez punching downward multiple times for the next two minutes. According to Lopez's statement to investigators and testimony by Butler, Plaintiff was screaming before and perhaps during the assault. (Doc. Nos. 80-4 at 2, 68-8 at 3.) Throughout this time, McGill remained seated at his desk ten feet away, chatting with Officer Durham, talking with an inmate, and leaning back in his chair. The video shows Butler approached the turnkey desk as early as 1:02:43 a.m. to alert officers McGill and Durham; they moved to the holding cell at approximately 1:03:32 a.m.

In addition, by relying on this argument, Metro itself raises a genuine issue of material fact on causation, as the memorandum prepared by Chief of Security Johnson states that he and another administrator "walked the turnkey area" and concluded the turnkey officer could not have heard or seen the assault, or one like it. (Doc. No. 80-4 at 4.) Johnson wrote:

> The line of sight would have been obstructed based on the officers and witnesses [sic] location during the time of the assault. It would have been difficult to have heard the assault, with any noises around the work station. When we reviewed the noise level, it was fairly quite [sic] in turkey [sic], we had an officer go into the holding cell, sit on the bench, we closed the door, and we could not hear him yelling in the holding cell. The closer he got to the door, you could hear him, but not in the location Dressman was positioned.

31

(Doc. No. 80-4 at 5.)  Thus, the Court cannot find, as a matter of law, that the assault was "inevitable" and unrelated to the practice of isolation established in the jail at the time.  Rather, the Court finds that Plaintiff has offered sufficient evidence to establish a genuine dispute of material fact that Defendant Metro's policy of isolation caused a deprivation of his constitutional rights.

b. Failure to Train or Supervise

In his Complaint, Plaintiff also alleges that DCSO failed to "train or supervise [DCSO] deputies who act as the custodial guards for the pretrial detainees."  (Doc. No. 1 at 12.)  Unlike his practice of isolation claim, however, Plaintiff has offered scant evidence and has not created a genuine dispute of material fact to withstand summary judgment.

A municipality can be held liable under Section 1983 for deprivations of federal rights stemming from the municipality's failure to train or supervise employees.  Plaintiffs must show that: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

The Sixth Circuit has identified two ways to demonstrate a municipality's deliberate indifference under a failure to train or supervise theory.  First, Plaintiff may "show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (citing *Fisher v. Harden,* 398 F.3d 837, 849 (6th Cir. 2005)).  In the alternative, "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations

32

presenting an obvious potential for such a violation, could trigger municipal liability." *Id.* (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 409 (1997)).

However, "deliberate indifference is a 'stringent standard of fault,' for which 'even heightened negligence will not suffice.'" *Plinton v. Cnty. of Summit*, 540 F.3d 459, 465 (6th Cir. 2008) (internal citations omitted).

Here, Defendant has established that CJC officers undergo at least 160 hours of initial training over five to six weeks, which includes training on inmate supervision, in addition to ongoing in-service training. (Doc. No. 68-1 at 3–4.) Plaintiff does not offer any evidence to challenge the adequacy or the content of this training, apart from conclusory allegations in his expert's report that DCSO's failure to train or supervise its officers might explain why its officers exposed Plaintiff to an "obvious" safety risk. (Doc. No. 120-1 at 8.) *Compare Fisher,* 398 F.3d at 849 (holding plaintiff showed insufficient evidence that officers received inadequate training) *with Russo v. City of Cincinnati*, 963 F.2d 1036, 1047 (6th Cir. 1992) ("Although plaintiffs concede that the officers received the amount of training cited by the district court, they dispute that the content of the training was adequate."). The Court cannot accept as true mere allegations without factual evidence as support.

Thus, the Court finds that Plaintiff's failure to train or supervise claim under Section 1983 fails as a matter of law.

### c. Failure to Enforce Medical Screenings

In his Complaint, Plaintiff also alleges that Defendant Metro had a custom of failing to enforce its policy of providing medical screenings to intake detainees. (Doc. No. 1 at 12.) As with his failure to train or supervise claim, however, Plaintiff has failed to offer any evidence to establish a genuine dispute of material fact regarding the adequacy of Defendant Metro's medical screening.

33

Neither has he shown any evidence that would establish a causal link between the alleged practice and his deprivation of rights. Thus, Plaintiff's claim that Defendant failed to enforce medical screening must fail as a matter of law.

B. *State Claim: Municipal Liability for Negligence*

In his Complaint, Plaintiff also puts forth a state law claim against Defendant Metro under the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. §§ 29-20-101 to 29-20-408, alleging that Defendant Metro is liable for the negligence of its officers. (Doc. No. 1 at 12–13.) However, Defendant argues it is immune from suit under the TGTLA's "civil rights" exception as a matter of law. (Doc. No. 15–17.) The Court agrees.

The TGTLA codifies the state's common law rules on sovereign immunity, and states that municipalities are immune from suit with certain enumerated exceptions. *Campbell v. Anderson Cnty.*, 695 F. Supp. 2d 764, 776 (2010) (citations omitted); *see Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 79 (2001). Section § 29-20-205(2) of the TGTLA provides that "[i]mmunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of . . . (2) . . . civil rights." Tenn. Code Ann. § 29-20-205 (2012) (West). This "'civil rights' exception has been construed to include claims arising under 42 U.S.C. § 1983 and the United States Constitution." *Johnson v. City of Memphis*, 617 F.3d 864, 872 (6th Cir. 2010) (citing *Hale v. Randolph*, No. 1:02-CV-334, 2004 WL 1854179, *17 (E.D. Tenn. Jan. 30, 2004)). Thus, when a plaintiff's claim under the TGTLA "arises out of the same circumstances giving rise to her civil rights claim under § 1983," it will fall within the TGTLA civil rights exception, and the municipality will be immune from suit. *Id.* (noting the this is the conclusion of a "majority of district courts addressing this question"); *see also Anderson*, 695 F. Supp. 2d at 777 ("Although [plaintiff] may seek to

34

circumvent or avoid the County's immunity . . . by couching some of her civil rights claims . . . in the guise of negligence, this strategy fails."); *Newby v. Sharp*, No. 3:11-CV-534, 2012 WL 1230764 at * 4–5 (E.D. Tenn. April 12, 2012).

Here, the Court finds the Plaintiff's negligence claim against Defendant Metro for the actions of its officers arises out of the same circumstances giving rise to his civil rights claim, and, as a result, the TGTLA provides Defendant Metro immunity from suit. Plaintiff does not allege separate facts to show acts of negligence by Defendant Gise and officers McGill and Durham. Rather, because Plaintiff's entire negligence claim is limited to the events on April 24 and 25, 2010, surrounding his assault, the foundation of his negligence suit would comprise the same acts as his Section 1983 claim. Thus, Plaintiff's state law claim under the TGTLA is **DISMISSED with prejudice**.

## IV.    CONCLUSION

For the reasons above, Defendant Gise's Motion for Summary Judgment (Doc. No. 65) is **DENIED**; Defendant Metro's Motion for Summary Judgment (Doc. No. 70) is **DENIED** as to Plaintiff's federal claim under Section 1983, and **GRANTED** as to Plaintiff's state law claim under TGTLA, which is **dismissed with prejudice**.

It is so ORDERED.

Entered this the _____ day of November, 2012.

_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT

35